24-2998 Western Arkansas, Tina Hight v. Deputy Brian Williams et al. Michael Mister Kitchens. here ready. You may proceed. It pleases the court.  My name is Trey Kitchens. I represent the appellant in this matter. Tina Height. We're asking for this court to reverse and remand the district court's ruling. Granting summary judgment in favor of the appellees in this case. On August 30th, 2022, Tina Height called the Columbia County Sheriff's Department for help. Approximately 4 o'clock in the morning, deputies Glass and Williams showed up at her house. Important to note that in no time in this case, Tina Height a suspect. Was there a suspect at the house or was a warrant being served? As the deputies approached the house, deputy Glass went to the front porch. There were dogs barking. As soon as deputy Williams heard dogs barking, he immediately started screaming profanity, saying he was going to F and kill the dogs. While that's not dispositive of a 1983 issue or 4th Amendment issue, it is important to note that that's the color of deputy Williams as he got there. On your first point, just as a factual question, you said there was no crime. There was she wasn't under suspicion, but I understood it being a call for domestic violence incident. Could you expand on that for me? Yes, sir. Tina Height called because she got in a fight with her  The boyfriend was gone. He was not at the place and hadn't been for several hours. The deputies were not. They didn't. Columbia County is a big place. They didn't get there quickly. But there was nobody there that was accused of a crime, a suspect of a crime or anything else. Did the police know that? I mean, was there evidence that they were told? Yeah, the suspects no longer there. Don't don't worry about it. There's a video which is part of the record in the record as they approach the house. The deputies are talking about. Oh, we've been here before. This is the lady with the dogs. They didn't say anything about whether or not they knew the suspect was there. But your Honor, you bring up a great point. Domestic violence instances are incredibly dangerous for police officers. Nine-pound Pomeranians are not. When the dog started barking, Deputy Williams after screaming he's going to F and kill this lady's dogs for barking at their own house, fired a warning shot completely in contrary of all policies and procedures of Columbia County. It's argued in the opinion of the court as well as in opposing counsel's brief that was to warn the dogs. Somehow they ascribed factual circumstances of warning a dog by firing a warning shot. Can I I want to I want to just you you talk about the dog not being dangerous. I want to explore that because every case I could find did not involve a dog and it involved shooting and you hit the wrong person. It's a sort of a bystander case and I don't think and this is what what I'm going to ask is I don't think you can seize a dog under the Fourth Amendment and every outward manifestation here was get that dog away from me. I mean, I've watched the video. I'm going to shoot that dog. Get it away from me. I mean, and everyone knew he was shooting at the dog. And so my question is, is, you know, when we have a bystander there seems to be an element of transferred intent like in criminal law. Well, I meant to seize this person, but I actually seized this person and but if you can't seize a dog, then how could this possibly be a seizure of Ms.  It's the Monroe case your honor that talks about in all 1983 litigation has to be viewed in the light of the natural and probable consequences of your actions. The distance and if you've seen the video, you know, this the distance from the deputy to his height was approximately from me to you. Not much more. He fired a nine millimeter hot loaded defensive Golden Sabre round and a nine pound dog that was coming at him. She was standing directly beside him and deputy glass was closer than judge than the chief judges to you even on the screen. It is solely by luck that he didn't kill somebody suppose it was a hundred pound German Shepherd with just, you know, different case. And your honor, it's so nice when the court makes my point for me, you're making factual determinations, which is what the district court did in granting summary judgment, which she's not supposed to do the factual determinations and determinations about what was or wasn't dangerous. Those were facts for a jury to decide not for the district court to make her determinations and she didn't even mention the size of the dog in her order. That's one of the points we make in our briefing. What one? Yeah, I understand. But one last question. I just want to ask I understood it to be agreed at the district court. You can tell me I'm completely wrong. This is my understanding of the record is that everybody agrees that every outward manifestation of what he was doing focused on the dog and that both sides agreed that yeah, he was shooting at the dog but hit her. Is that incorrect? Are you saying now that actually there was some indication that he was shooting at another person or shooting at her? He was shooting at the nine-pound Pomeranian that was coming at him. It wouldn't have reached the top of his boot and Deputy Williams is a combat Marine and what you have to do is you have to do it and that by the way, the district court did no analysis of the application of deadly force, which I don't think can be argued in good faith that was not used here and that standard is what would an objectively reasonable officer do in the same situation not in hindsight. We have a unique circumstance here. We have an objective officer who was there Deputy Glass who's actually on the porch who wasn't hurling profanities wasn't yelling firing warning shots wasn't shooting at the dog. The dogs were all around him to his feet. We know what an objective officer would do because there was one right there not doing what Deputy Williams did. That happens frequently in 1983 actions, right? I mean one officer responds an officer standing three feet away does not and yet we find the existence of qualified immunity repeatedly in those cases, you know one shot one officer fires another officer freezes. Yes, sir. There's certainly those cases but the cases and Judge Strass said their instance of shooting the wrong person shooting at a suspect trying to trying to save somebody trying to defend the officer. None of that is present here. Your Honor. We have to look at the fact that the justification the deputy Williams used to fire was he was he wasn't shooting at a pit bull and it's interesting that in opposing counsel's briefs. He talks about being charged by dogs plural, which is another factual determination, which is not supported by the video which should have precluded summary judgment. They can't get away from the fact that this was a nine-pound Pomeranian charging a combat veteran Marine who was wearing boots and he thought the justification was to fire his  And then I was here at kitchens. Isn't the point go still that the officer was attempting to seize property or a thing under the Fourth Amendment and he accidentally seized the person and having our cases said that in that situation the law is not clearly established that there is a seizure. You know, I was the person who was hit by the bullet. That's aimed elsewhere. That's the problem. Your Honor. It wasn't aimed elsewhere. It was aimed directly at Miss Height and the Monroe case. I thought you said it was I thought you said a minute ago was all agreed that he was attempting to seize the property of the dog. Miss Height was standing directly behind the dog and the Monroe case in the Brown vs. Us, which is an 8th Circuit case both say you are bound by the natural and probable consequences of your actions. You can't just throw your hands. I'm saying hey, I didn't mean to shoot her when you're I mean, it's you teach Cub Scouts that you don't deploy firearms and something you're not willing to destroy and behind this nine-pound dog was Miss Height and deputy glass both. They can't get away from that. You're bound by the natural and probable consequences of your actions. This was not a defense of others. This was not attempting to arrest or apprehend a suspect. This is a man who was scared of dogs and didn't need to be an officer. There are no other questions. I'll reserve the rest of my time. Thank you, Mr. Thank you. Mr. Owens. Your Honor Smith please the court. My name is Jason Owens. I represent Deputy Williams and the other County parties here. Let me start there. No argument was made here or in the briefing about the sheriff the former sheriff or the County liability. Our position is of course that those arguments have been waived. Let me respond briefly to the standard in Fourth Amendment cases. Of course, our position is that we don't even get there because the Fourth Amendment isn't even implicated here, but it was intimated an argument that the Fourth Amendment was violated because the other officer didn't engage in exactly the same actions as officer Williams. That's exactly the opposite of the standard in Fourth Amendment cases. Of course, it's not a question of whether any reasonable officer would have acted differently. It's a question of whether any reasonable officer would have acted in the same manner. And of course there are dogs are shot at and shot by officers. On a daily basis in the state of Arkansas and elsewhere around the country. You know, I don't know. I was I was a I was a County judge and a municipal judge and I handled all got large cases in large numbers. And I mean, I understand that officers destroy dogs frequently, but this is a weird case. Anyway, you cut it. I mean, first of all, we're in an occupied area and no one on the planet that I have ever seen has fired a warning shot into the air and it is only by the grace of God and fortuity that somebody doesn't end up dead because they know gravity is gravity and that round is coming back to the earth someplace, right? And whatever kind of conduct that is. I don't believe that the county would ever train somebody to do that. Right? And the second thing is, you know, I don't believe I have ever seen a dog destroyed under circumstances where there is a human being within the line of fire. I mean, it's these are really outrageous facts and the video doesn't make it look any more compelling that your officer was engaging in conduct. We want to encourage. So let me try to speak to all those. First of all, with respect to the warning shot, I agree. The county agrees. In fact, the argument made in this case is that it violated county policy because there was a county policy directly prohibiting warning shots. Of course, that doesn't create a constitutional violation as this court's precedents have held on any number of occasions with respect to shooting. And this argument has been advanced sort of progressively through this case in using different language. We start with the complaint. The complaint says that Williams quote fired at the dog page 2, app 17, page 5 of the complaint, page 20 of the complaint is expressly alleged that he fired at the dog and something hit the plaintiff on the front steps. But he says in that claim that the firearm was discharged at a dog. So those claims were expressly made in the complaint. They've been expressly made in the appeal briefing in this case, in the statement of the case and in the argument. The assertion is made by the appellant that the firearm was discharged at the dog. We expressly argued in our summary judgment motion that there was no claim made and there's never been any claim made that there was an unlawful seizure of property here. Of course, that's the claim you make if you're alleging that there was some seizure of the dog. No claim like that was made. No response was made to that argument on summary judgment. Yeah, and the weird part about this too is that a dog is of course property. And when I was asking about the seizure of the dog earlier, you don't see a situation in which somebody walks in and shoots a stereo or TV, right? I mean, I suppose that could happen, but you know, you're shooting a dog, right? So you're not, and so the transfer to 10 is when you're shooting a bystander, but here you have a dog and instead you sort of accidentally shoot a person. And so this is a really, really weird case. In addition to all the terrible facts that Judge Erickson's been talking about. It absolutely, and let me speak to the line of fire question that was asked. Of course, we take a different position. My position is that when you're shooting into the ground, that there is no line of fire. This isn't the case where you're shooting at the suspect across the crowded Plaza, where maybe there being a transfer to 10 argument. This is, I'm shooting into the ground. Yes, there were people close. Was it from a negligent standpoint, the right thing to  I think there are some obvious criticisms. The but the officer signal from the very beginning. He is concerned about the dogs. Again. There was testimony by the plaintiff that several of the dogs were pit bull mixes. I've watched the video a hundred times. I've slowed it down. And to me, it certainly appears that there were multiple dogs headed in his direction, at least two. I see a large gray, and it's a blur. I mean, we're in the dark at night. I know y'all have watched the video. I'd ask you to look for that. I think there were multiple dogs advancing toward him. He did end up shooting this orange dog, a Pomeranian mix. I think is what she testified in her deposition, mixed with a larger dog. So it's a little bit larger than a normal Pomeranian, but those are really small dogs. I get it. But the question here isn't that question. The question is whether, A, the Fourth Amendment is even implicated. I think the district judge engaged in the appropriate analysis and reached the same conclusion this court reached just last year in the Irish case and in the others that we cited in our briefing, that where you don't have any intent and regardless, and of course, the qualified immunity argument is enmeshed with this question of whether a subjective or objective standard applies to that question of intent. Regardless, there's no objective or subjective indicators that this officer had any intent other than to shoot at the dogs that were advancing at his feet. Was there any evidence presented of a ricochet? Because when you watch the video, it looks like the gun is pointed down, not at Ms. Height, but clearly she got shot. So I'm trying to figure out if there's any evidence that sort of proves that he was shooting at the dog. Something hit her, we believe, because she responded instantaneously, right? It wasn't something where an hour later she pops up with this. So she responds instantaneously. There were graze marks on her upper thigh, I believe, and then what appeared to be some type of puncture wound on the lower leg. I don't believe, I know there was some indication that in a medical record that was submitted by the plaintiff that there was a bullet fragment. It was not removed. I think at best we're talking about a guess and probably what that medical record indicates is what she told a doctor that she visited months after this event about what was in her leg. But it seems the likely result was that it was some sort of ricochet and whether that's concrete in her leg or a piece of a bullet fragment, I think is probably impossible to tell unless and until they were moving. I don't think there are any plans to do that. The factual questions raised by the plaintiff, and we addressed this in our briefing, but the factual questions raised by the appellant here just end up being irrelevant because it just doesn't matter whether the dog was sufficiently scary enough, whether his fear of that was justified. It just doesn't matter whether the, I think the closest they come is this question of line of fire, but even that question ends up not mattering, even though I think it's a false question because I don't think there's any line of fire when you're shooting into the ground at your feet. Of course, one of the dangerous things I think there is, you know, you don't always know how deep the dirt goes and that sort of thing, but when you're aiming at the dog at your feet, there's no evidence of subjective or objective intent to do anything other than shoot the dogs that you're concerned about. The question of whether that was a rational concern or not is irrelevant under this court's jurisprudence. For those reasons, Your Honor, we would ask that the district court's ruling be affirmed in its entirety. If there are no further questions. Thank you, Your Honors. The ruling of the district court was what was in that leg was not concrete or dirt. It was a bullet. That's what the district court found. But no evidence of a ricochet. We just don't know on this record. No, I believe it. I believe it hit the ground and then ricocheted off. Oh, it did. Yes, sir. If you watch the video, I believe that's what it shows. Counsel got up and said to me, there were several dogs running. That's a factual determination for the jury. What I think and what he thinks doesn't particularly matter. Yeah, you know, and that's one of the things too about the idea that somehow that Pomeranians are inherently non-dangerous. Where in fact, we know that they are as breed aggressive. They're yippy little dogs. And they are aggressive if not properly socialized. Sure. That's just a real, I know this, my daughter's got them. But I'm just telling you that I'm a little bit worried about the idea that just because it's a little dog, that's not dangerous. Little dogs can hurt people. And Your Honor, those are factual determinations and I agree that they're factual determinations and the district court ignored the size of the dog and what kind of dog it was. The district court ignored the fact that there were people standing behind the shooter. The district court ignored the fact that he discharged and the sheriff claimed to be 146 grain defensive round bullet, which is going to ricochet off concrete and anybody who's ever fired a gun knows that. Fact after fact after fact that the district court made the determination about ingraining summary judgment, which is inappropriate while we're asking for this court to reverse and remand so we can have a trial. To no other questions. Thank you. Thank you, Mr. Kitchens. I want to thank the parties for their briefing and argument that's been helpful. We'll take the matter under advisement and rule in due course.